DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Katherine Russell, | CASE NO. 4:10 CV 02179 |
|     Plaintiff, | |
| | JUDGE DAVID D. DOWD JR. |
| v. | |
| | MEMORANDUM OPINION |
| Christopher Davis, et al., | AND ORDER |
|     Defendants. | |

**I. INTRODUCTION**

This action arises from the in-custody suicide of the decedent, Jason Miller ("Miller"),[1] who fatally shot himself in the backseat of a St. Clair Township police cruiser with a handgun he concealed from officers during his arrest. Plaintiff, decedent's mother and administrator of decedent's estate, brought this action in the Columbiana County Court of Common Pleas, alleging several causes of action against St. Clair Township, St. Clair Township Police Chief Donald Hyatt ("Hyatt") and the two arresting officers, Officer Christopher Davis ("Davis") and Sergeant Steven Brophey ("Brophey"). The defendants removed this action to the Northern District of Ohio.

The plaintiff relies on one set of general factual allegations, but asserts several different

---

[1]Any subsequent references to "Miller" refer only to the decedent, Jason Miller. To avoid any confusion, other individuals with the same last name will be referred to with only their first or full names.

(4:10 CV 02179)

legal bases for relief.  In order, the plaintiff claims that: 1) the defendants violated Miller's rights under the U.S. Constitution in violation of 42 U.S.C. § 1983, 2) the defendants' policies, practices and failure to train led to the violations of Miller's right under the U.S. Constitution, also in violation of 42 U.S.C. § 1983, 3) the defendants violated Miller's rights under the Ohio Constitution, 4) the defendants failed to accommodate Miller's disability in violation of the Americans with Disabilities Act, hereafter ADA, 42 U.S.C. § 12132 *et seq*, and 5) the defendants caused Miller's wrongful death in violation of Section 2125.01 of the Ohio Revised Code.

The complaint states each of these claims against all defendants generally.  However, based on the facts alleged, it appears to the Court that the plaintiff's federal claims apply only to specific defendants.  First, the plaintiff's claim for individual constitutional violations under Section 1983 applies only to the alleged actions of the defendant arresting officers, Davis and Brophey.  Second, the plaintiff's Monell claim for unconstitutional policies and failure to train applies only to the municipal defendants, St. Clair Township and Chief Hyatt.  Finally, the plaintiff's ADA claim applies only to St. Clair Township.

The current matter comes before the Court on the defendants' motion for summary judgment on the plaintiff's claims brought under 42 U.S.C. § 1983.  The plaintiff opposed defendants' motion, and defendants replied.  For the following reasons, the Court 1) GRANTS the defendants' motion for summary judgment on the plaintiff's claims under 42 U.S.C. § 1983, 2) sua sponte ENTERS JUDGMENT in favor of the defendants on the plaintiff's claim under the ADA, and 3) REMANDS the plaintiff's remaining claims for wrongful death and violations of the Ohio Constitution to the Columbiana County Court of Common Pleas.

2

(4:10 CV 02179)

**II. FACTS**

### A. Events Leading Up to the Day of the Jason Miller's Suicide

On September 5, 2008, Jason Miller was arrested for shoplifting at a Wal-Mart by St. Clair Township Police Officer James Briggs.[2]  At the time of the arrest, Miller falsely identified himself as 'Chris Miller,' his brother, and gave Briggs a false social security number.  Briggs released Miller pending his appearance in court on September 8, but Miller failed to appear and a warrant was issued for 'Chris Miller.'

After learning of the warrant issued for his arrest, the real Chris Miller contacted the St. Clair Police Department.  On September 9, 2008, Chris Miller and his wife Trisha Miller went to the St. Clair Police Department and met with Officer Scott Mick.[3]  During the meeting, Chris and Trisha informed Mick that it was 'Jason Miller' and not 'Chris Miller' who was arrested for shoplifting on September 5.  After confirming this information with the prosecutor's office, Mick dropped the charges against Chris and issued a new warrant for Jason Miller.

As he and his wife were leaving the meeting, Chris Miller warned Officer Mick of a rumor he had heard that Jason was contemplating "suicide by cop."  In his deposition, Chris Miller remembered the conversation this way:

> And I said, Yeah, by the way, my brother's been telling a bunch of people down from Liverpool that he's going to do suicide by a cop. I don't know what that exactly pertails[sic], but pay attention and protect yourself, you know, he may be armed, but I don't know.

---

[2] Officer Briggs is not named as a defendant in this action and his actions do not serve as a basis for any of the plaintiff's claims.

[3] Officer Mick is also not named as a defendant in this action.

3

(4:10 CV 02179)

C. Miller Dep. ECF Doc. No. 44 at p. 37; *See also* T. Miller Dep. ECF Doc. No. 45 at p. 19.

When officer Mick asked Chris what he thought it meant that Jason was "going to do suicide by a cop," Chris responded:

> And I said, I'm not sure, but if he has a knife or something to that effect, Taze him instead of shoot him, because he's not going to -- he wasn't a violent person.

C. Miller Dep. ECF Doc. No. 44 at p. 34. As Chris remembers, he was just concerned about the safety of his brother and the officers:

> Well, yeah. I said, Don't shoot him. Taze him. I mean, it was all kind of a laid back conversation and we're all just getting ready to leave, but I wanted them to know that that's what they were saying, because I don't want to see anybody get hurt if that's what he was saying. Better to be safe than sorry.

C. Miller Dep. ECF Doc. No. 44 at p. 37.

Officer Mick remembers the conversation in much the same way. He states that the Millers told him that Jason was going to attempt "suicide by cop" by pulling a knife and forcing the officers to shoot him because he wasn't brave enough to do it on his own. S. Mick Dep. ECF Doc. No. 43 at p. 31; ECF Doc. No. 34-1 at p. 3.

Whether and how Mick communicated this information after his meeting with the Millers is not clear. Plaintiff claims that Mick told at least three other officers, including defendants Davis and Brophey, about the "suicide by cop" threat. In an interview with Columbiana County Sheriff's Deputy Allan Young on the night of Miller's suicide, Mick stated that he passed the warning on to the other officers.

> Q. Okay. Did you pass this information off to anybody else?

4

(4:10 CV 02179)

> A. Yes.
>
> Q. Who?
>
> A. Chris Davis; Steve Brophey; I think Jim Briggs; the afternoon crew that was going on yesterday after I was leaving.

ECF Doc. No. 34-1 at p. 3.  However, Mick seemed uncertain about when and from whom he got the warning.  In his interview, Mick states that he received the "suicide by cop" warning from Trisha Miller "yesterday," i.e. September 11, 2008, but Chris Miller testified that he gave Mick the warning on September 9, 2008.  In his deposition, three years later, Mick was even less certain about the dates and with whom he shared the information.

> Q. Did you have any conversations with your fellow officers about the warnings or concerns that Trisha and Christopher Miller shared with you?
>
> A. Yes.
>
> Q. Who did you discuss that with?
>
> A. I believe Steve Brophey, Chris Davis, and whoever else was coming in on daylight, or on afternoon shift, Jim Briggs.
>
> Q. Was it the day that you talked to the Millers or was it after?
>
> A. I don't recall. I would imagine it was that day.
>
> Q. Okay. And from your report, can you tell what that date was?
>
> A. 9-9 of '08.
>
> Q. Okay. Does your narrative indicate when you talked to them on the back [of the report]?
>
> A. What time?
>
> Q. What day. Does it also contain --

5

(4:10 CV 02179)

> A.  9-9, 2008.
>
> Q.  So on the shift change of the 9th, is that your recollection or your best belief that you spoke to Brophey and Davis and others --
>
> A.  Well, whoever. I don't recall exactly who it was that was in that room, but everybody was in there was given the information.
>
> Q.  And when you say, "that room," what room are you referring to?
>
> A.  We have like a squad room where we do all our reports and everything is in there. So that's why we generally go right as we get there and right as we're leaving.
>
> Q.  Okay. Now, you indicated that you're not sure whether it was on the 9th or the next day. You're not positive.
>
> A.  I'm not 100 percent sure.
>
> Q.  And what did you tell the officers in the squad room?
>
> A.  The information that Trisha had given me, and that's [sic] Jason is possibly suicidal, but he wanted the police department to do his dirty work for him.

S. Mick Dep. ECF Doc. No. 43 at p. 33-35.

Defendants Davis and Brophey, however, claim that they knew nothing about the "suicide by cop" threat before the arrest.  In his interview after the suicide, Davis admitted hearing something from Mick that Jason Miller "wasn't going to go back to jail easily," but claims that he did not hear about this until after the arrest and suicide. ECF Doc. No. 34-2 at p. 21-22.  Later, in his deposition, Davis was sure that he did not have this information before arresting Miller. C. Davis Dep. ECF Doc. No. 39 at p. 61-62.  Brophey is more clear.  He states that he never received information from Officer Mick that Jason Miller was intending to commit "suicide by cop" or even that Miller intended to pull a weapon during arrest. S. Brophey Dep. ECF Doc. No. 38 at p.

6

(4:10 CV 02179)

99-101.

### B. The Day of Jason Miller's Suicide

On September 12, 2008, Jason Miller attempted several times to surrender himself on the outstanding warrant. Miller and his mother, the plaintiff Katherine Russell ("Russell"), first attempted to turn Miller into the East Liverpool Police Department, and then the Columbiana County Jail, but neither accepted him. Finally, Miller and Russell went to the St. Clair Township Police Department, but when they arrived, it was closed. An East Liverpool police dispatcher, who directs the calls for St. Clair Township, told Miller and Russell that they should return on Monday, September 15. Failing to accomplish Miller's surrender, Miller and Russell returned to Russell's house where Miller was staying in the garage. Sometime later, Russell left Miller at the house to attend a horse racing event with Chris and Trisha Miller.

At the race track, Russell complained to Trisha Miller about Jason's unsuccessful attempts to surrender. Trisha Miller then called Officer Mick, who was off-duty at the time. Trisha told Mick that Jason wanted to turn himself in and that he would be waiting in Russell's garage. Trisha also claims that she told Mick to tell the officers to be careful because she was not sure about Jason's state of mind. T. Miller Dep. ECF Doc. No. 45 at p. 27-28. Mick remembers the call differently. He states that Trisha told him that Jason was willing to give himself up, that he just wanted a shower and a hot meal, and that it would be the easiest arrest all day. S. Mick Dep. ECF Doc. No. 43 at p. 41-42. Mick then states that he called Officer Brophey and gave him the same information: that Miller was ready to surrender, that he was staying in Russell's garage, and that he would be an easy arrest. S. Mick Dep. ECF Doc. No. 43 at p. 43.

7

(4:10 CV 02179)

After the call, Brophey and Davis met back at the police station, and the two drove towards Russell's house in separate police cars.  Before reaching Russell's house, Davis and Brophey saw someone fitting Miller's description walking along the road.  The person, who actually was Miller, first identified himself as Fred Smith.  By this point, Davis had stepped out of his police car and approached Miller.  After a short conversation with the officers, Miller admitted that he was, in fact, Jason Miller.

Sometime between the time when Russell left Miller at her house and when he was spotted along the road, it is undisputed that Miller broke into Chris and Trisha Miller's home.  While in the home, Miller broke into a locked gun case and stole two handguns and ammunition.  After the theft, it appears that Miller hid one of the handguns in his clothing and discarded the other.  Miller was apparently on his way back from the break-in when defendants Davis and Brophey came upon him.

### C.  The Arrest and Suicide

The only witnesses to the events surrounding Miller's arrest were the defendants, Davis and Brophey, and Miller himself.  When he was stopped, Miller was wearing a long sleeve shirt and jeans, and according to the defendants, wearing long john underwear and carrying a jacket.  One of the officers took Miller's jacket, and then Officer Davis handcuffed Miller's hands behind his back.  The parties dispute what occurred after Davis handcuffed Miller and before he placed Miller in the back of his cruiser.

Davis claims that while Brophey was asking Miller questions, he performed a thorough pat down search, feeling around Miller's waistband, running up and down his legs, feeling around

8

(4:10 CV 02179)

the ankles, crotch area and Miller's pockets. Brophey also states that he watched Davis perform the search. It is undisputed that at the time of this alleged search, Miller was carrying a Ruger .357 Magnum Revolver nearly 12 inches in length. It also undisputed that Davis did not discover the gun before placing Miller in the back of the cruiser.

The plaintiff contends, however, that Davis never searched Miller. To support this claim, the plaintiff offers the expert testimony of Dr. Michael D. Lyman ("Lyman"), a police trainer and professor of criminal justice. Based on his knowledge and experience, Lyman states that Davis could not have conducted the search he described, or even a less thorough search, and not have discovered Miller's gun. Lyman Dep. ECF Doc. No. 42 at p. 71. Therefore, Lyman opines that Davis never performed a search at all. Lyman Dep. ECF Doc. No. 42 at p. 72.

The parties do not dispute, however, that Davis next placed Miller in the back seat of his police cruiser and closed the door. Davis then walked back to Brophey to inspect a piece of metal Brophey found wrapped in Miller's jacket. At this point, the officers heard what they described as a muffled shot. Approaching Davis' car, the officers found that Miller had fatally shot himself in the mouth. Miller was still handcuffed, but his hands were contorted to his right side and the handgun was lying on the seat next to him.

During the arrest, both officers claim that Miller was calm and compliant. They state that Miller answered their questions in a low, calm voice and did not appear to be agitated or threatening. They also state that Miller did not appear to be under the influence of any drugs or alcohol at the time of arrest. Nothing in the record conflicts with this testimony, and there is no evidence reflecting that Miller showed any signs of violent or erratic behavior during the arrest,

9

(4:10 CV 02179)

or that he attempted to draw his weapon on the officers.

### III.  LAW AND ANALYSIS

#### A.  Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The main inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter or law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

#### B.  Section 1983 Standard

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  To support a claim under Section 1983, a plaintiff must "identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)).

Plaintiff's complaint alleges separate constitutional violations under the Fourth, Eighth and Fourteenth Amendments.  Although the plaintiff alleges a Fourth Amendment violation, there

10

(4:10 CV 02179)

are no facts to show an injury related to an unreasonable search or seizure.[4] Instead, the primary basis of the plaintiff's claim is that Officers Davis and Brophey violated Miller's constitutional rights by failing to protect him from self-harm while he was in their custody. It is under the Eighth and Fourteenth Amendments that the state can be held constitutionally liable for a failure to protect, or provide for the adequate medical needs of, individuals in its custody. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *DeShaney v. Winnebago Cty. Dept. of Soc. Services*, 489 U.S. 189, 198-200 (1989). As the Eighth Amendment does not apply to pretrial detainees, the plaintiff's claim is properly analyzed under the analogous rights provided solely under the Fourteenth Amendment. *See Watkins*, 273 F.3d at 685-86.

### C. Fourteenth Amendment

"To sustain a cause of action under [Section] 1983 for a failure to provide medical treatment, a plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Id.* (quoting *Estelle*, 429 U.S. at 104). This inquiry has two components, one objective and one subjective. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). "To

---

[4] Although the plaintiff concedes that her principal claim falls under the Fourteenth Amendment, she argues that the Fourth Amendment may still be relevant to the extent that the officers' actions were objectively unreasonable, citing *Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010). In *Aldini*, the Sixth Circuit held that a claim of excessive force brought against an official for his intentional actions during the booking process – after a warrantless arrest but before a probable cause hearing – should be analyzed under the Fourth instead of the Fourteenth Amendment. *Id.* at 864-67. By citing *Aldini*, the plaintiff seems to argue, at least implicitly, that since Miller committed suicide after arrest but before any hearing, the Fourth Amendment should apply. However, unlike the excessive force claim in *Aldini*, the injury alleged here does not derive from an official's unreasonable seizure. Instead, the Constitutional violation allegedly occurred as a result of the defendants' failure to protect Miller from self-harm. Therefore, neither *Aldini* nor the Fourth Amendment are relevant to the plaintiff's claim.

11

(4:10 CV 02179)

satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 703.

The courts have emphasized the subjective nature of this second component. As is often stated, "deliberate indifference entails something more than mere negligence." *Farmer*, 511 U.S. at 835. It is not enough to show that an official *should have been aware* of the substantial risk of harm. *Watkins*, 273 F.3d at 686. The plaintiff must show that the official *was aware* of facts from which to draw an inference of substantial risk, and that he or she actually drew that inference. *Id.* (quoting *Farmer*, 511 U.S. at 837). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

In a suicide case, the objective component is easily met. The Sixth Circuit has recognized that psychological needs rising to the level of suicidal tendencies are serious medical needs for the purposes of the Eighth and Fourteenth Amendments. *Comstock*, 273 F.3d at 703; *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994).

With respect to the subjective component, however, there are inherent difficulties in assessing whether officials can be held liable for failing to prevent something as unpredictable as suicide. *Detroit v. Gray*, 399 F.3d 612, 616 (6th Cir. 2005). Therefore, the proper inquiry in a detainee suicide case is "whether the decedent showed a strong likelihood that he would attempt

12

(4:10 CV 02179)

to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Id.* (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992)).  As the Sixth Circuit has recognized, this holding confirms "that there is no general constitutional right of detainees to receive suicide screening or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of suicide. *Id.*; *See also Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989).

### *1. Subjective Awareness*

The primary inquiry in this case is the subjective awareness of defendants Davis and Brophey.  To support her claim, the plaintiff must show that Davis and Brophey were subjectively aware of a substantial risk that Miller might take his own life.

Assuming the facts as alleged by the plaintiff, Davis and Brophey received the warning from Officer Mick that Miller might attempt "suicide by cop" at least a day before the arrest.  The plaintiff argues that the defendants' knowledge of this warning alone is more than sufficient to show that Miller was a substantial risk of attempting suicide.  However, the mere earlier mention of suicide is not a talisman. "When examining deliberate indifference [the court is] obligated to examine the totality of the circumstances surrounding the alleged actions or inaction." *Cavalleri v. Shepard*, 321 F.3d 616, 625-26 (7th Cir. 2003).  Therefore, the likelihood of the threat of suicide must be weighed in light of all the facts known to the defendant officers at the time of Miller's arrest.

In this case, Chris Miller's warning that Jason Miller might attempt "suicide by cop" is the only evidence tending to support the plaintiff's claim that the officers were aware of a

13

(4:10 CV 02179)

substantial threat of suicide.  The record also shows that a short time before the arrest, Mick told Brophey of Miller's earlier attempts to surrender, and that Miller was waiting in Russell's garage ready to surrender.  When the Davis and Brophey finally confronted Miller on the street, it is undisputed that he was passive, calm and compliant.  There is no evidence in the record that Miller showed the officers any sign that he wished to attempt suicide, voiced any threats about committing suicide or hurting himself, or showed any signs of aggressive or erratic behavior.  Further, Miller did not appear to be under the influence of alcohol or drugs.  There is also no evidence that Miller ever attempted to resist or to draw the gun he had concealed on his person.

But for the single warning from Miller's brother three days earlier that Miller was contemplating "suicide by cop," there was no information to infer any threat of Miller committing self-inflicted suicide, much less a substantial threat. "To commit 'suicide by cop' is to act in a way that would require law enforcement officers to respond with lethal force." *U.S. v. List*, 200 Fed.Appx. 535, 544 n. 2 (6th Cir. 2006).  Consistent with this understanding, Chris Miller specifically warned that Jason might pull a knife on the officers and force them to shoot him.  However, Jason Miller did not exhibit any conduct consistent with Chris Miller's warning.  The record does not show that Miller did anything but allow the defendants to arrest him.  The record reflects that the defendants were able to handcuff Miller and place him in the back of the police cruiser without incident.  By the time that Miller was handcuffed and alone in the back seat of the police car, any threat that Miller might attempt "suicide by cop" was abated.

Only where there is sufficient evidence to show that the decedent was a substantial risk of suicide have courts imposed a constitutional duty upon officials to take precautions to prevent a

14

(4:10 CV 02179)

suicide. In each of the cases cited by the plaintiff where the court imposed such a duty, the decedent clearly expressed an intent to commit suicide to either the officials or to someone else, and the decedent's own behavior greatly enhanced the likelihood of threat. In *Cooper v. County of Washtenaw*, 222 Fed.Appx. 459, 461-63 (6th Cir. 2007), the decedent made several direct suicide threats to both officers and court personnel, he had been placed on suicide watch, and he was dressed in a gown specially made for suicidal inmates when the offending officers picked him up for transport. *Id.* In *Elliot v. Cheshire Cty.*, 940 F.2d 7, 9 (1st Cir. 1991), the decedent told two fellow inmates that he wanted to take his own life, he had been banging his head against the bars of his cell trying to break his own neck, and the other inmates told jail officials about the decedent's suicide threats and erratic behavior shortly before the decedent hung himself.[5] In *Rodgers v. Chapleau*, 2000 WL 1785837, *1 (6th Cir. 2000), an unpublished Eighth Amendment case, the decedent had only recently been taken off of suicide watch and told a guard that he was going to hang himself only hours before actually doing so.

The facts here are clearly distinct from these cases. Here, there was no direct threat of suicide from Miller and his actions never raised any suspicion that he was suicidal. The only

---

[5] Throughout her brief, the plaintiff relies heavily on *Elliot*, noting that the Sixth Circuit cited to it in *Barber*. However, the Court finds not only that *Elliot* is factually distinguishable, but also that it is inconsistent with the Sixth Circuit in its application of the law. In *Elliot*, the court states that an official can be held liable if he or she "knew, or reasonably should have known, of the detainee's suicidal tendencies." 940 F.2d at 10-11. This infers that the deliberate indifference standard includes something nearer to simple negligence. The Sixth Circuit, and even the First Circuit, has consistently applied a stricter standard. *See Watkins*, *supra*; *Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir. 1992) (recognizing, just one year after *Elliot* was decided, that *Elliot*'s loose standard is inconsistent with a majority of other circuits and even the First Circuit's own precedent).

15

(4:10 CV 02179)

evidence even tending to show that Miller was a suicide threat was a single third-party warning three days earlier that he might attempt "suicide by cop."  This alone is insufficient to support the claim that Miller was a substantial risk of suicide.  Consequently, the Court finds that there is not sufficient evidence upon which a reasonable jury could conclude that Davis and Brophey were aware that Jason Miller was a substantial risk of committing suicide once in custody.

### *2. Conscious Disregard*

As there is insufficient evidence to show that David and Brophey were aware of a substantial threat of suicide, the plaintiff is unable to show that the officers consciously disregarded that risk.  The plaintiff makes much of the fact that Officer Davis's alleged search failed to discover Miller's handgun, claiming even that Davis never performed a search at all.  Assuming that Davis did not perform a search, however, does not change the Court's analysis.  The Sixth Circuit has been clear that an official has no constitutional duty to take precautions to prevent a detainee from committing suicide until the detainee demonstrates a substantial likelihood of doing so.  *See Gray*, 399 F.3d at 616; *See also Barber*, 953 F.2d at 239-40, *Danese*, 875 F.2d at 1244.  The Court is not aware of, and the plaintiff has not alleged, any stand alone constitutional duty to search an arrestee.  Therefore, in the absence of a substantial threat of suicide, the fact that Davis did not perform a search does not alone establish conscious disregard of Miller's serious medical needs.

Under different circumstances, the failure to find a hidden weapon may constitute deliberate indifference.  In *Richards v. S.E. Alabama Youth Serv. Diversion Ctr.*, 105 F.Supp.2d

16

(4:10 CV 02179)

1268, 1275 (M.D.Ala. 2000), the arresting officer knew the decedent was suicidal and that he had made threats of committing suicide with a gun.  Even after the decedent's mother pleaded with the officer to take extra precautions against the decedent's suicide, the officer failed to either handcuff the decedent or to perform anything more than a cursory search  *Id.*  The officer even joked with the mother that the decedent may have had a gun in his pocket that he did not want the officer to find. *Id.* at 1272, 1275.  After dropping the decedent off at a juvenile detention center, the officer also failed to inform the detention center staff of the mother's report that the decedent was suicidal. *Id.* at 1275.  Shortly after being dropped off, the decedent ran off into a nearby woods and shot himself in the head with a gun he had hidden in his pants. *Id.* at 1273.  Based on these facts, the *Richards*' court found that the officer's failure to find the concealed handgun and failure to inform others in the chain of custody about the suicidal proclivities of the decedent did rise to the level of conscious disregard. *Id.* at 1276.

The facts in this case are nothing like those in *Richards*.  Here, Davis and Brophey did not know that Miller was a substantial risk of committing suicide, and there was no threat that Miller was contemplating self-inflicted suicide with a gun.  It is undisputed that upon arresting Miller, Davis and Brophey took Miller's jacket away from him, handcuffed him behind his back and placed him in the backseat of a locked police car.  Unlike the decedent in *Richards*, Miller never presented a substantial threat of committing suicide and Davis and Brophey's actions did not rise to the level of conscious disregard.

Based on the foregoing, the Court finds that there is insufficient evidence to create an issue of fact on the issue of deliberate indifference.  Therefore, the Court grants summary

17

(4:10 CV 02179)

judgment in favor of the individual defendants on the plaintiff's claim brought under 42 U.S.C. § 1983.

### D.  Municipal and Official Capacity Claims

The plaintiff argues that St. Clair Township and Police Chief Donald Hyatt are liable for constitutionally deficient official policies and for the failure to train in violation of 42 U.S.C. § 1983.  Municipal defendants cannot be held liable under Section 1983 if there is no underlying constitutional violation.  *Watkins*, 273 F.3d at 687 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  Therefore, the Court grants summary judgment in favor of the municipal and official capacity defendants.

### E.  ADA Claims

In addition to her Section 1983 claims, the plaintiff filed a single claim for failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq*.  Neither the defendants' motion for summary judgment nor the plaintiff's response address the ADA claim.  However, because the matters already fully briefed and argued by the parties are dispositive of this issue, the Court sua sponte enters judgment in the defendants' favor.

Although the practice of sua sponte granting summary judgment on a claim is disfavored, it is not prohibited.  *Excel Energy, Inc. v. Cannelton Sales Co.*,  246 Fed.Appx. 953, 959 (6th Cir. 2007).  "The key inquiry is whether the losing party was on notice that he had to muster the necessary facts to withstand summary judgment, lest he face the dismissal of his claims." *Id.* at

18

(4:10 CV 02179)

959-60. Where notice is lacking, the focus is on the possibility of prejudice to the losing party. *Id.* at 960.

Title II of the ADA states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Sixth Circuit has directed that to establish a claim of discrimination under the ADA, a plaintiff must prove that "(1) she has a disability; (2) she is otherwise qualified; and (3) she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely[6] because of her disability." *Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005). The plaintiff must also show that the disability discrimination was *intentional*. *Tucker v. Tennessee*, 539 F.3d 526, 535 (6th Cir. 2008). This showing is a higher burden than deliberate indifference. *See Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 575 (5th Cir. 2002).

The plaintiff's ADA claim is based on the same set of facts as her constitutional claims discussed above and similarly based on the existence of Miller's alleged suicidal intentions. Because the Court has already concluded that a reasonable jury could not find that the defendants' actions were deliberately indifferent to this serious medical need, the plaintiff cannot meet the higher burden of showing that the defendants intentionally discriminated against Jason Miller

---

[6] The Court recognizes that the sole reason element of this inquiry is currently under en banc review in the Sixth Circuit. *See Lewis v. Humboldt Acquisition Corp., Inc.*, No. 09-6381, Order Granting Petition for Rehearing En Banc (6th Cir. Jun. 2, 2011). However, this element is not relevant to the Court's opinion.

19

(4:10 CV 02179)

based on that alleged disability.  The Court also finds that because the plaintiff has not alleged sufficient facts to support her ADA claim, the plaintiff will not be unduly prejudiced by its dismissal.  Therefore, the Court enters judgment in favor of the defendants on the plaintiff's claim under the ADA.

### III.  CONCLUSION

For the forgoing reasons, the defendants' motion for summary judgment is GRANTED as to the plaintiff's First and Second claims for relief under 42 U.S.C. § 1983, JUDGMENT is ENTERED in favor of the defendants on the plaintiff's Fourth claim for relief under the ADA, and the plaintiff's Third and Fifth claims for relief under state law are REMANDED to the Columbiana County Court of Common Pleas.


IT IS SO ORDERED.


| April 24, 2012 | *s/ David D. Dowd, Jr.* |
|---|---|
| Date | David D. Dowd Jr. |
|  | U.S. District Judge |